(64 South. 122.)

No. 19,584.

RUST LUMBER CO. v. GENERAL ACCIDENT, FIRE & LIFE ASSUR. CORP., Limited.

(Dec. 15, 1913. Rehearing Denied Jan. 19, 1914.)

*(Syllabus by the Court.)*

INSURANCE (§ 435*)—POLICY—CONSTRUCTION.
    A policy of insurance, issued to a company engaged in a business described as "sawmill, planing mill, mill yards, kilns, sheds, woodsmen and teamsters," and insuring it, as trustee, against bodily injuries sustained by the employés of the assured, through external, violent, and accidental means, while actually engaged in operations such as are usual to the kind of trade or business so described, does not cover the risk incurred in the employment of mill hands in the boring of an artesian well, for the obtention of water. It is true that the business so described presupposes the use of water and the necessity for obtaining it, but so it presupposes the use of fuel wherewith to

convert the water into steam, and yet it would hardly be argued that the policy, as written, would cover the risk of mining for coal, or boring for fuel oil.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1144; Dec. Dig. § 435.*]

Appeal from Twelfth Judicial District Court, Parish of Sabine; Don E. Sorelle, Judge.

Action by the Rust Lumber Company against the General Accident, Fire & Life Assurance Corporation, Limited. From judgment for plaintiff, defendant appeals. Reversed and dismissed.

P. M. Milner, of New Orleans, for appellant. S. D. Ponder and R. A. Fraser, both of Many, for appellee.

### Statement of the Case.

MONROE, J. Plaintiff alleges that defendant insured it, as trustee for its employés, against bodily injuries sustained by them "through external, violent, and accidental means, while actually engaged in the occupations and at the places mentioned in the schedule of statements," forming part of the policy, which, in turn, is made part of the petition. It further alleges that, within the life of the policy, certain of its employés, whom it names, received certain injuries for which, under the terms of the policy, defendant is liable. Then follow a description of the injuries so received, further allegations as to the liability of defendant for medical attention, drugs, etc., and for the penalty prescribed by law for nonpayment of the claim within 30 days, and the prayer for judgment. There is no allegation in the petition as to the particular work that the employés were engaged in when injured, and defendant excepted, on the ground that the allegations, as made, were vague, and disclosed no cause of action, which exception was overruled. Defendant then answered, denying that said employés received the injuries set forth in the petition whilst engaged

in the usual occupations of a sawmill business, and alleged that:

"On the contrary, the assured was attempting to drive an artesian well in the vicinity of its plant, and directed the employés and men injured to engage in that work, * * * that they were inexperienced, and that the work formed no part of the operations of the sawmill business, and was not contemplated under the terms of the policy, and was not included in the risks or hazards which were assumed by the insurer."

### Opinion.

The policy sued on contains the following provisions, which, we think, are conclusive of the question of liability vel non, when considered in connection with the facts developed on the trial, to wit:

" * * * The company does hereby insure Rust Lumber Company, Ltd., of Many, parish of Sabine, * * * as trustee for his employés, * * * against bodily injuries sustained by the employés of the assured, * * * through external, violent, and accidental means, while actually engaged in the occupation and at the places mentioned in the schedule of statements, as follows."

According to "statement 4," of the "schedule of statements," thus referred to, the business in which the assured was engaged was "sawmill; mill yards; kilns; sheds; woodsmen and teamsters"; the place of business was "Many, Sabine parish, Louisiana"; and the statement further reads, in part:

"It is understood and agreed that this policy covers all employés of the company to which the same is issued, * * * at the above locations, for the purposes of the trade or business described herein to whom compensation is paid, except as follows: . President, vice president, secretary, treasurer, and office force."

"Statement 5. The operations carried on are those usual to the kind of trade or business described herein."

It appears from the evidence that plaintiff, finding its water supply inadequate, assigned some of its mill employés, including its outdoor superintendent, a carpenter, blacksmith, filer and sawyer, teamster, and two negro laborers, to the work of boring an artesian well, in order to obtain a further supply. The men were all entirely inexperienced in

that kind of work, and, after they had bored to a depth of about 50 feet, one of them accidentally dropped a monkey-wrench down into the hole, thereby blocking further progress. Plaintiff thereupon employed a man whom it had previously employed as a filer and sawyer, but who was said to have bored two wells for himself, and was thought, therefore, to have acquired some knowledge of the manner in which the work should be done, and he and the others were engaged, at the time of the accident, in the attempt to fish out the monkey-wrench. The pump which had been used in connection with the boring had broken down, however, and they concluded, in order to keep the cuttings and sediment from settling in the bottom of the boring, to connect a half inch pipe to the "blow-off," or mud valve, of the boiler, and, keeping up steam, force the hot water down into the hole. Plaintiff's outdoor superintendent says, in his testimony:

"We had been using this method that day for probably four or five hours at the time the accident occurred, and we supposed that we had hooked the wrench, and were lifting up the pipe to find out, when the water seemed to have been blown out of the well, probably from a pocket of steam forming where the water was discharging in the well."

He further testifies that the temperature of the water that was thus forced into the well was above 212 degrees Fahrenheit, that part of it was converted into steam by contact with the air, and that, when the explosion occurred, it was thrown at least 100 feet in the air, and, in coming down, extended over a radius of about 50 feet, scalding every one with whom it came in contact.

We are unable to concur in (what we suppose was) the view taken by the judge a quo, that the operations thus carried on were "those usual to the kind of trade or business" described in the policy sued on. It is true that the business so described presupposes the use of water and the necessity for obtaining it, but so it presupposes the use of

fuel wherewith to convert the water into steam, and yet it would hardly be argued that the policy, as written, was intended to insure against the risk of mining for coal, or boring for fuel oil. The judgment appealed from is therefore reversed; plaintiff's demand is rejected, and its suit is dismissed, at its cost, in both courts.